FILED
2011 Aug-05  PM 03:21
U.S. DISTRICT COURT
N.D. OF ALABAMA

Vikram K. Badrinath, Esq.  (*Pro Hac Vice*)
VIKRAM BADRINATH, P.C.
100 North Stone Avenue, Suite 302
Tucson, AZ  85701-1514
(520) 620-6000
*vbadrinath@aol.com*]

Russel R. Abutryn, Esq.
MARSHAL E. HYMAN & ASSOCIATES
3250 West Big Beaver, Suite 529
Troy, MI 48084
(248) 643-0642, Ext. 15
*rabrutyn@marshallhyman.com*

Mark R. Barr, Esq.
LICTHER & ASSOCIATES, P.C.
1601 Vine Street
Denver, CO 80206
(303) 554-8400
*mbarr@lichterassociates.com*

Andres Benach, Esq.
DUANE MORRIS, LLP
505 9th Street, N.W. Suite 100
Washington, D.C. 20004-2166
(202) 776-7812
*ACBenach@duanemorris.com*

Deborah S. Smith, Esq.
LAW OFFICE OF DEBORAH S. SMITH
7 West Sixth Avenue, Suite 4M
Helena, MT 59601
(406) 457-5345
*deb@debsmithlaw.com*

*Attorneys for Amicus Curiae*
American Immigration Lawyers Association

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| HISPANIC INTEREST COALITION, *et. al.*, OF ALABAMA, *et. al.*, <br><br> *Plaintiffs*, <br><br> vs. <br><br> ROBERT BENTLEY, in his official capacity as Governor of the State of Alabama, *et. al.* <br><br> *Defendants*. | Case No.:  **CIV-11-02484-SLB** <br> Date:  **08/05/11** <br><br><br><br><br> **MEMORANDUM BRIEF OF *AMICUS CURIAE*, AMERICAN IMMIGRATION IMMIGRATION LAWYERS ASSOCIATION** |

# I.    INTRODUCTION

On June 9, 2011, Governor Robert Bentley signed into law HB56. Effective[1] September 1, 2011, Alabama House Bill 56 ("HB56"), seeks to identify and punish "aliens unlawfully present" in nearly all aspects of life in Alabama. Unprecedented in its scope and breadth, HB56 is premised upon the idea that Alabama law enforcement can locate and identify illegal immigrants by virtue of their "unlawfully present" status and force their deportation because of federal government inaction. However, "unlawfully present" is not a fixed, cognizable status under federal immigration law and Alabama's proxies that illegal immigrants are identifiable by their "unlawful presence," lack of a driver's license or other document, appearance or ethnicity, or failure to present a birth certificate for enrollment in public educational institutions is based on fundamental misconceptions about federal immigration law – both in theory and in practice. *Amicus*, the American Immigration Lawyers Association ("AILA"), writes to correct myths that underlie HB56 and to demonstrate that, when placed in context of federal immigration law, HB56 is unworkable.

Significantly, HB56 sweeps broadly in scope and attempts to regulate important facets of life and business conducted in the state, seeking to ensnare "unlawfully present" aliens in its net. Specifically, HB56 attempts to regulate education (by requiring schools to determine immigration status), business (refusing the recognition of private contracts), employment (by creating new criminal provisions against unauthorized employment and requiring employers to participate in the federal E-Verify program), police enforcement (encouraging racial profiling during any stop, arrest, or detention), as well as in numerous other areas, including benefits and medical services, affecting daily Alabaman life. HB56, sections 28, 27, 11(a), 15, 12, respectively. In doing so, HB56 effectively marginalizes all individuals present in the state who

---

[1]  Some provisions have different effective dates. For example, Sections 22 and 23 (related to state law enforcement staffing and coordination), went into effect immediately. Sections 9 and 15 (related to employment verification) become effective on April 1, 2012.

do not comport with the vagaries of the state's definition of "unlawful presence."   HB56 also creates new immigration-related state criminal provisions; all of which are pre-empted by federal law.  Because the premise upon which HB56 is based, namely a person's "unlawful presence" conflicts with federal law, it is pre-empted and unworkable.

Should HB56 become effective it will undoubtedly burden all Alabama residents, not just those *perceived* to be foreign nationals in appearance, language, or race, including U.S. citizens and lawful permanent residents, subjecting them to unreasonable searches and seizures of their persons and vehicles, prolonged detentions, and result in unregulated, illegal racial profiling.

## II.   STATUTORY BACKDROP

HB56 requires police "where *reasonable suspicion* exists that the person is an *alien* who is *unlawfully present* in the United States, a reasonable attempt shall be made, when practicable, to determine the citizenship and immigration status of the person." HB56, Section 12 (emphasis added). Detention is required until the immigration status of the person is verified. *Id.*  The new provision allows Alabama law enforcement authorities to make "some" determination of immigration status, while verification with federal immigration authorities is pending. *Id.*  The new law creates new Alabama-specific immigration crimes (relating to failure to carry alien registration documents and for unauthorized employment).   HB56, Sections 10(a), 11(a). Section 18 provides that an officer may make a warrantless arrest if he is unable to determine that a person has a valid driver's license, detain and transport the person to the nearest magistrate in violation of Fourth amendment protections against unreasonable searches and seizures.  HB56, Section 18(b), amending Section 32-6-9, Code of Alabama 1975.

The emphasis on using "unlawful presence" as the primary law enforcement tool is unworkable.  Similar to other state legislative attempts at "attrition through enforcement," the laws purpose is to discourage "illegal aliens" from coming to the state.  *See* State of Alabama, Joint Interim Patriotic Immigration Commission Report (Feb. 13, 2008) ( "We recommend

1   illegal immigrants be discouraged from coming to Alabama.")  The purpose of the legislation

2   uses unlawful means to reach its ends.

3        HB56 interferes with the right and access to education, and creates an unworkable,

4   discriminatory environment requiring Alabama schools to determine the immigration status of

5   students, their parents, and arguably permits such data collection and compilation to be reported

6   to federal authorities.  HB56, Sections 28(a), 28(a)(5).  Section 8, HB56 unfairly and illegally

7   denies enrollment in public postsecondary educational institutions to otherwise eligible aliens

8   whom the Federal government has recognized are authorized to be in the United States by

9   unnecessary permitting only a narrow group of individuals who "*must either possess* lawful

10   permanent residence or an appropriate nonimmigrant visa."  HB56, Section 8 (emphasis added)

11   .

12
### III.   ARGUMENT

13

14     **A.**     **HB56 is fatally flawed in that it is based upon an incorrect, incomplete, and conflicting definition of "lawful presence."**

15

16        Running throughout the core of HB56, and critical to its implementation, is the concept

17   of a non-citizen's "lawful presence," or its converse, "unlawful presence." Determination of that

18   status underlies many of the law's provisions, including: section 7 (state and local public

19   benefits); section 8 (public postsecondary education); section 10 (registration); section 12 (law

20   enforcement stops and booking); section 13 (harboring and transportation); section 19 (status

21   verification during criminal confinement); section 20 (notification following conviction);

22   section 27 (contracts); section 28 (reporting requirements for public elementary and secondary

23   schools); and section 30 (business transactions with the state).

24        Despite the obvious significance of these terms to the overall structure and operation of

25

26

27

28

HB56, the law does not define them, instead relying upon federal verification[2].  Such reliance presumes that there are easily transferrable definitions of these terms in the Immigration and Nationality Act ("INA"), when there are not. And to the extent that "unlawful presence" can be read as a substitute for "illegal alien," or some other layman's term, such an interpretation presumes that a person's immigration posture is simple, static and binary (e.g., a person is either legal or illegal), when in fact a non-citizen's position is quite often complicated, fluid and multi-faceted.  The real-life complexities of a noncitizen's particular immigration posture make the HB56's reliance on a list of documents that serves as proxies for "lawful presence" especially problematic, with that list being both under-inclusive and over-inclusive.

## 1.    The INA and Lawful and Unlawful Presence

The INA does not contain any definition of "lawful presence" or "lawfully present." It does contain a definition of "unlawful presence," at 8 U.S.C. § 1182(a)(9)(B)(ii),[3] but not one of general applicability.  Instead, that term of art is be used only when assessing two (2) specific grounds of inadmissibility[4], under 8 U.S.C. §§ 1182(a)(9)(B) and (C), and applied only where the accumulation of certain periods of "unlawful presence" creates bars to future admissions once a person has departed from the United States.  In essence, the statute is never applied to a noncitizen living within the United States, until they have both accrued "unlawful presence" and then departed.  Even so, Congress has created specific statutory exceptions applicable only to section (B), but not section (C), 1182(a)(9)(B)(iii)(I-V), as well as various agency-crafted

---

[2]  Beason-Hammon Alabama Taxpayer and Citizen Protection ("BATACPA") § 3-10 ("A person shall be regarded as an alien unlawfully present in the United States only if the person's unlawful immigration status has been verified by the federal government pursuant to 8 U.S.C. § 1373(c).").

[3]  For purposes of the inadmissibility provisions at § (B) and § (C), unlawful presence is defined as any presence in the U.S. occurring after the expiration of the period of stay authorized by the Attorney General, or presence in the U.S. without being admitted or paroled.

[4]  Inadmissibility refers to a specific reason why a noncitizen can be refused admission to the United States, either as an immigrant or a nonimmigrant. *See* INA § 212(a), 8 U.S.C. § 1182(a).

non-binding policy exceptions to the accumulation of unlawful presence. *See* Donald Neufeld, Lori Scialabba, and Pearl Chang, *Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I)* (May 6, 2009) (outlining the differences between "unlawful status" and "unlawful presence" under federal law and the complexities in determining the same).[5]

Moreover, it is unreasonable that the Alabama legislature intended to use the existing, federal definition of "unlawful presence" found in the INA in the same manner found in HB56. Such a reading would lead to absurd results, since many noncitizens are deemed to be accruing "unlawful presence" even though they have permission to live and work in the United States. For example, a noncitizen in removal proceedings who has applied for a discretionary form of relief called cancellation of removal, is permitted to apply for and receive work authorization during the pendency of his application, and cannot be removed from the U.S. until there is a final, administrative decision on his application. *See* 8 C.F.R. § 245.2(c)(5)(ii) (noting that there is no right to an administrative appeal, but an applicant can review before an immigration judge). Despite the legal authority supporting his continued presence in the U.S., he is considered, under the terms of 8 U.S.C. § 1182(a)(9)(B)(ii), to still be accumulating unlawful presence during the course of proceedings.

Conversely, noncitizens can be without a valid status yet still not be unlawfully present under federal immigration law. For example, a student on an F-1 visa, whose period of stay does not have a date certain for its termination, does not accumulate any unlawful presence even after dropping out of school, or otherwise violating the terms of his nonimmigrant visa, unless and until an immigration judge or USCIS examiner makes a formal finding of a status violation. *See* Memo, Michael A. Pearson, *Period of Stay Authorized by the Attorney General after 120-*

---

[5] *http://www.uscis.gov/USCIS/Laws/Memoranda/Static_Files_Memoranda/2009/revision_redesign_AFM.PDF* (last visited July 31, 2011).

*Day Tolling Period for Purposes of Section 212(a)(9)(B) of the INA* (March 3, 2000)[6].

A literal adaptation of the definition of "unlawful presence" at 8 U.S.C. § 1182(a)(9)(B)(ii) for use in HB56 would also render whole sections of the state law meaningless, once the statutory exceptions to unlawful presence were applied. For example, HB56 § 28 mandates that school officials regularly report the number of "aliens believed to be unlawfully present in the United States enrolled at all primary and secondary schools." A literal adaptation of the definition of "unlawful presence" in the INA grounds of inadmissibility would render the entire reporting scheme moot, since aliens under the age of 18 do not accumulate any unlawful presence. 8 U.S.C. § 1182(a)(9)(B)(iii)(I).

Finally, while HB56 makes clear that the federal government makes the final determination of "unlawful presence," certain sections require *preliminary* determinations by law enforcement officials, public officials, and private citizens.  These sections impose such severe penalties for dealing with an "unlawfully present" individuals that many people are likely to simply avoid any dealings with anyone remotely capable of being "unlawfully present." Section 12, for example, calls for law enforcement personnel to determine the citizenship and immigration status of a person where "reasonable suspicion exists that the person is an alien who is unlawfully present in the United States." Similarly, section 13 makes it an offense for a person to rent to a noncitizen where the person "knows or recklessly disregards the fact that the alien is unlawfully present in the United States." Section 27 makes legally invalid any contract entered into a party and "an alien unlawfully present in the United States, if the party had direct or constructive knowledge that the alien was unlawfully present in the United States."

Implementation of HB56, therefore, would create many scenarios where people would be called to make quick, summary judgments about a person's lawful, or unlawful, presence in the United States.  Yet the actual law governing "unlawful presence" determinations under 8 U.S.C. §§ 1182(a)(9)(B) and (C) is lengthy and convoluted, with technical provisions

---

[6]  *http://www.uscis.gov/files/pressrelease/PofStay4023Pub.pdf*

determining exactly when a person begins, and stops, accruing periods of unlawful presence. It is quintessentially a *legal* term, with no easily, readily identifiable way of determining whether someone is, or isn't, unlawfully present. USCIS, in its "summary" guidance on the topic, took over fifty-one (51) pages to describe under what circumstances a noncitizen might be accumulating unlawful presence, and when not. *See* Donald Neufeld, Lori Scialabba, and Pearl Chang, *supra*, fn. 4.  Even this guidance has not been universally adopted by other federal enforcement agencies or the courts.  *See Carrillo de Palacios v. Holder* __ F.3d __, 2011 WL 2450985 at *6, n.4 (9th Cir. 2001) (rejecting noncitizen's reliance on USCIS guidance).  To require state law enforcement and ordinary citizens to make these complicated, legal determinations, without a proper understanding of what actually constitutes "unlawful presence" in the INA is to invite abuse, with those preliminary determinations made on the basis of appearance alone.

### 2.     Unlawful Presence as a Substitute for "Illegal Alien"

Assuming then that the drafters of HB56 did not mean for "unlawful presence" to have the technical, restricted meaning it has in 8 U.S.C. §§ 1182(a)(9)(B) and (C), then the only other possible meaning is as a substitute term for "illegal alien," based on a belief that the federal immigration laws clearly distinguish the "illegal" from the "legal." That assumption is simply incorrect—the INA contains no general definition of legal/illegal status.

Rather than categorizing people in these static, binary terms, immigration law is actually a complex web of various types of statuses, ranging from lawful permanent residents ("green card" holders) to people with final orders of removal who nevertheless are authorized to be in the United States under supervision. Many foreign-born individuals simply cannot be adequately described with an either/or, illegal or legal, labeling system. People who fall in the interstices include: (1) people who may have derived or acquired United States citizenship through an American parent or parents, but do not have proof of that status (or are not even

aware of it); (2) people with pending removal proceedings or appeals; (3) people without a current status, but with applications for residency or to change or extend their status pending before USCIS; (4) people who have been ordered deported but who have been granted deferral of removal under the Convention Against Torture or withholding of removal due to the probability of persecution or torture if they were to return to their countries of origin; (5) people who could be or have been ordered deported but have been granted deferred action (a form of prosecutorial discretion); (6) persons subject to final orders of removal who cannot be deported because their countries of origin refuse to repatriate them or because they are stateless; (7) immigrant victims of domestic violence, crime,[7] or severe forms of human trafficking; and; (8) certain immigrant juveniles who may be entitled to remain permanently in the United States as "special immigrant juveniles." 8 U.S.C. § 1101(a)(27)(J).

People in the midst of an ongoing removal proceeding are, by definition, in some category other than "legal" or "illegal," since they are awaiting a final decision on their inadmissibility or removability. 8 U.S.C. § 1229a(a)(1). The cases of noncitizens who have been through removal proceedings, and found to be removable, are particularly complex, since there are many reasons why a noncitizen actually ordered removed by an immigration judge (and thus potentially "illegal" or "unlawfully present") might not be subject to deportation, with a clear right to remain in the U.S. (and thus, at the same time, "legal," or "lawfully present"). For example, the removal order may be on appeal at the Board of Immigration Appeals ("BIA")

---

[7]  In light of the lack of a federal definition of "illegal alien" or an "unlawfully present" alien, HB56 presents a particularly acute problem for noncitizens who have been the victims of serious crimes. Congress has authorized the issuance of nonimmigrant U-visas to certain crime victims in return for their cooperation with law enforcement. A person may qualify for the U-visa even if he or she has committed an aggravated felony offense or has an outstanding order of removal. 8 C.F.R. § 214.14(c)(5)(i). Because of the resultant ambiguity of whether a pending U-visa application takes someone out of the "illegal" or "unlawfully present" category, HB56 could authorize the detention of U-visa applicants in direct contravention of Congress's intent to protect victims of crime and to encourage them to report crimes and cooperate with police. While Section 21 stays all provisions of HB56 for certain crime victims, it only does so for the duration of the related legal proceedings connected to that offense. It is not clear whether the related legal proceedings would include the filing of any applications for immigration benefits created by the criminal incident.

and therefore not yet administratively final. 8 U.S.C. §1101(a)(47) (explaining that an order becomes final upon decision by the BIA or where the time to seek BIA review lapses). Or it may be the subject of a stay by a federal court of appeals during a petition for review. *See Nken v. Holder*, 129 S.Ct. 1749, 1756–57 (2009) (describing federal court authority to grant a stay). A federal district court may have issued a writ of habeas corpus, or granted a temporary restraining order, or a preliminary injunction, preventing the execution of a removal order. *See, e.g., Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 558 (9th Cir. 1990) (explaining that district courts have broad discretionary power to fashion equitable relief). The BIA, or an immigration judge, or the Department of Homeland Security ("DHS") may have granted a stay of removal pending review of a motion to reopen or motion to reconsider. *See, e.g.*, 8 C.F.R. § 1003.23(b)(v) (explaining that while the filing of a motion to reopen does not stay removal, the immigration judge, Board, or Service may stay removal during the pendency of the motion). The U.S. Attorney General may have granted a stay of removal for an individual who is needed as a witness in a prosecution or whose removal is otherwise not practicable or proper. *See* 8 U.S.C. §1231(c)(2). Other noncitizens with removal orders may be protected against deportation in part by binding agreements sanctioned by federal courts, such as the settlement reached in *American Baptist Churches v. Thornburgh,* 760 F. Supp. 796 (N.D. Cal. 1991) (ABC Agreement).[8]

Simply put, immigration law is too complex,[9] and varied, to have its myriad classifications forced into the type of dichotomous system mandated by HB56, where all noncitizens are either lawfully present, or unlawfully present. It is telling that the federal immigration laws, upon which HB56 ultimately rely for verification of "lawfulness," do not

---

[8]  The ABC agreement is just one example of agreements struck in federal courts that bind federal agencies from deporting certain aliens with final orders of removal. *See* Memo, INS, Pearson HQASY120/12/11 (Feb.23, 2001), reprinted in 78 No. 9 Interpreter Releases 444, 455–64 (Mar. 5, 2001).

[9]  *See, e.g., Lok v. INS*, 548 F.2d 37, 38 (2nd Cir. 1977) (noting the "striking resemblance to some of the laws we are called to interpret and King Minos's labyrinth in ancient Greece . . . examples we have cited of Congress's ingenuity in passing statutes certain to accelerate the aging process of judges.").

attempt this bifurcation. It is simply unworkable—like putting a square peg in a round hole—and will only lead to delay, confusion and abuse.

**B.    HB56, Section 12 facially, and as applied, permits unreasonable searches and seizures of persons based upon their perceived "unlawful presence."**

**(B)(1).**  Section 12, HB56 requires police during *any* lawful stop, detention, or arrest "where *reasonable suspicion* exists that the person is an *alien* who is *unlawfully present* in the United States, a reasonable attempt shall be made, when practicable, to determine the citizenship and immigration status of the person."  HB56, Section 12 (emphasis added).  Although the provision purports that a police officer "may not consider race, color, or national origin" in implementing the law, such consideration is *specifically* allowed as "permitted by the United States Constitution or the Constitution of Alabama of 1901."  And, under federal and state law, race *may* be taken into consideration.  *United States v. Brignoni-Ponce*, 422 U.S. 873, 886-887 (1975); *see e.g., State v. Graciano*, 653 P.2d 683, 687, n.7 (Ariz. 1982) (citing *State v. Becerra*, 534 P.2d 743 (1975)).  Hence, race-based enforcement deserves a special scrutiny because it disproportionately burdens persons of Latin American ancestry in the United States, the vast majority of whom are U.S. citizens, or lawful permanent residents.

On its face, and as applied, the provision permits police officers to unreasonably and unlawfully detain any person based upon their appearance and/or race.  Moreover, while their immigration status is "determine[d]," such individuals cannot be released.  *Id.*  Although the provision states that an officer shall not make a "final determination" regarding a person's immigration status, the law requires "some" determination which is *preliminary* in scope.  Such a *preliminary* determination is a necessary prerequisite in order for an officer to have a "reasonable suspicion" that a person is an alien or unlawfully present. HB56, Section 12(c) ("A law enforcement officer shall not attempt to independently make a *final* determination of

- 11 -

whether an alien is lawfully present in the United States.") (emphasis added).

Moreover, the provision on its face, unambiguously requires that all persons who are "arrested and booked into custody *shall* have his or her immigration status determined..." by verification with the federal government.  HR56, Section 12(b) (emphasis added).  Although the law states "any alien" arrested and booked shall have his immigration status determined, the presupposes that the person *suspected* is "an alien."  Otherwise, it would be superfluous to verify the status of "any alien," if it was already determined the person was, in fact, an alien. Hence, the law's provision requires a law enforcement officer to "verify" the status of *all* persons who are arrested and booked.  *Id.*   Such a scheme will lead to prolonged interrogations (to verify immigration status) and detentions beyond the ordinary, non-custodial police encounter found to constitutionally permissible.  *See e.g., United States v. Martinez-Fuerte*, 428 U.S. 543, 545 (1976) (holding that warrantless, internal checkpoint searches of vehicles are limited in scope and duration and are constitutional only if justified by consent or probable cause); *see also Terry v. Ohio*, 392 U.S. 1 (1968) (holding that police may only detain an individual based upon reasonable suspicion for a brief period of time, and  such seizure must be limited in duration and scope).

At the outset it should be noted that  there are no *apparent* identifiable characteristics of "alienage" or "unlawful presence" that allow the law to be enforced in a *constitutional* manner. The term "unlawfully present" as used in HB56 conflicts with the federal meaning of "unlawful presence."  HB56 fails to provide any workable definition of the critical terms "reasonable suspicion," "unlawfully present," or "alien."   Other than actually witnessing an individual crossing the border at a place other than that so designated, there is no possible mechanism for a law enforcement officer to have "reasonable suspicion" that a person is in the United States unlawfully, *without* using race or national origin as a factor.  Moreover, HB56's reliance on a statutory list of documents which purport to provide a presumption against unlawful presence, is misplaced as insofar as the list is incomplete and inadequate when compared to federal

immigration law.  HB56 is premised on the idea that police officers can easily identify alienage in an ordinary, police contact. This is an erroneous premise. U.S. citizenship is not a characteristic apparent to the eye or dependent upon a person's appearance insofar as it is a *legal* determination. U.S. citizens are not required to carry proof of their citizenship while inside of the United States. Therefore, it is unlikely that in a routine encounter with law enforcement a U.S. citizen will possess a birth certificate, U.S. passport, naturalization certificate, or certificate of citizenship demonstrating citizenship.

Moreover, alienage determinations are complex because they are *inherently legal* rather than factual determinations. Congress has constitutional power over nationality law which determines whether a foreign-born person is a U.S. citizen and "[c]itizenship law is probably the area of law where statutes remain relevant the longest, because even the most ancient and long-repealed statutes can still apply in a current case." Mautino, *Acquisition of Citizenship*, Immigration Briefings (April 1990).  Similarly, U.S. treaties and international covenants – which change over time – are  dispositive as to a person's citizenship status, regardless of the place of birth. *See, e.g.*, *Sabangan v. Powell*, 375 F. 3d 818 (9th Cir. 2004) (person born in Commonwealth of Northern Mariana Islands (CNMI) after January 9, 1978 is a U.S. citizen by virtue of covenant between U.S. and CNMI).

Birth in the United States certainly is a clear indicator that a person is not an alien. *See* U.S. Const. amend. XIV, § 1. But foreign-birth is not a certain indicator of alienage. Acquisition of citizenship at birth depends on numerous factors, such as the parents' respective citizenship (8 U.S.C. § 1401(c)-(e), (g)-(h));  the duration and timing of their residence in the United States (§ 1401(d)-(e), (g)-(h)); their marital status at the time of the individual's birth (§ 1409); the year in which the person was born (§ 1401(h)); the place where the person was born (§ 1041(c)-(e), (g)-(h)); and in some situations, even the date on which a child born out of wedlock was legitimated (§ 1409) – *none* of which can be ascertained or observed by police in any contact or that could give rise, constitutionally, to any suspicion of alienage. *See generally*, 8 U.S.C. §

- 13 -

1401(c)-(h) (establishing conditions under which children born in-wedlock outside of the United States acquire U.S. citizenship at birth) and § 1409 (establishing conditions under which children born out-of-wedlock outside of the United States acquire U.S. citizenship at birth). Hence, persons born outside of the United States, may still be U.S. citizens. *Id.*

Anyone can assert U.S. citizenship, and a law enforcement officer may be hard-pressed to identify a legitimate reason why such an assertion is untrue. Race, ethnic appearance, and language are not reliable indicators of alienage. *See, e.g., United States v. Montero-Camargo*, 208 F.3d 1122, 1132 (9th Cir. 2000) (*en banc*) ("The likelihood that in an area in which the majority – or even a substantial part – of the population is Hispanic, any given person of Hispanic ancestry is in fact an alien, let alone an illegal alien, is not high enough to make Hispanic appearance a relevant factor in the reasonable suspicion calculus."), *cert. denied*, 531 U.S. 889 (2000); *United States v. Manzo-Jurado*, 457 F.3d 928, 932 (9th Cir. 2006) (ruling that individuals' appearance as a Hispanic work crew, inability to speak English, proximity to the border, and unsuspicious behavior did not establish reasonable suspicion of illegal presence).

The citizenship question is further obscured because some individuals may not possess any documentation establishing their U.S. citizenship (because none is required). Foreign-birth is not dispositive on the question of alienage and it is an inappropriate factor for Alabama police to utilize. For example, a foreign-born child *automatically derives* U.S. citizenship by operation of law if a parent naturalizes before the child reaches the age of 18 and certain other conditions are met. *See* 8 U.S.C. § 1431(a). Yet, that individual may not possess a certificate of citizenship, a U.S. passport, or other document as evidence of his status. Indeed, he may not realize he is, in fact, a U.S. citizen. *See, e.g.*, *United States v. Smith-Baltiher*, 424 F.3d 913, 920-21 (9th Cir. 2005) (rejecting government's claim in an illegal reentry case that an individual could not assert derivative citizenship status because, *inter alia*, he did not have a certificate of citizenship). Likewise, an individual may automatically acquire U.S. citizenship through birth abroad to a U.S. citizen parent, and may not know that he is a U.S. citizen or may not possess

- 14 -

citizenship documentation. *See* 8 U.S.C. §§ 1401, 1409 (setting out various conditions whereupon individuals may acquire U.S. citizenship at birth). *See also* 8 U.S.C. § 1431(b) (setting forth conditions whereupon adopted alien children acquire U.S. citizenship automatically).

**(B)(2).**   Section 3-(10), HB56, provides a list of documents that demonstrate "lawful presence." *See* HB56, § 3-(10). This list is inadequate to give meaning to "unlawful presence" when measured against the federal rules.   The failure to possess any of these documents does not signify a person lacks authorized immigration status, or is deportable even if his status has expired or has been revoked. There are many examples of such situations.   A lawful permanent resident with an expired or old "green card" remains a lawful permanent resident, and is not deportable. *See, e.g.*, 8 U.S.C. § 1227 (listing classes of deportable aliens, and not including a ground for permanent residents without a valid green card); *see also* 72 Fed. Reg. 46922 (Aug. 22, 2007)(proposed rule, not promulgated, providing an application process for replacing certain old alien registration cards, and terminating the validity of the old cards, but not terminating the lawful status of permanent residents who possess the old cards), and USCIS Press Release of December 13, 2007 ("This proposed rule in no way affects the current validity of these permanent resident cards. Permanent residents who possess these cards may continue to use them as proof of permanent residency when traveling, when seeking employment, and at any time such proof is required."), *available at* http://www.uscis.gov/files/pressrelease/I551Update_13dec07.pdf.

Noncitizens who immediately qualify to adjust status to become lawful permanent residents, but who have not yet done so, are generally not deportable. *See generally* 8 C.F.R. § 1245.2 (providing immigration judges with jurisdiction over adjustment of status applications in removal proceedings). Asylum applicants, or individuals with non-frivolous claims for asylum that are not yet filed, cannot be deported until and unless their claims are adjudicated and a final administrative removal order exists. 8 U.S.C. §§ 1158 (establishing bases for asylum

and procedures), 1187(b) (providing for review of asylum claims for people admitted to the United States through the Visa Waiver Program), 1225 (providing for review of asylum claims to applicants for admission to the United States), and 1231 (establishing removal procedures for people with final administrative removal orders). Noncitizens who qualify for cancellation of removal or temporary protected status are not deportable. 8 U.S.C. § 1229b (cancellation of removal), and § 1254a (temporary protected status). Even noncitizens with final removal orders may not be deported, for example, if they qualify for certain relief due to the risk of persecution in their home country, or if the government is unable to effectuate deportation[10] or declines to enforce deportation for humanitarian reasons. 8 U.S.C. § 1231(b)(3) (withholding of removal) and § 1231(a)(7) (allowing employment authorization for certain aliens with final removal orders).

Here, the state of Alabama has attempted to usurp Congressional authorization through its own state-mandated immigration enforcement mechanism. Congress has intended for state officers to systematically aid in immigration enforcement *only* under the supervision and direction of the Attorney of the United States. *See* 8 U.S.C. § 1357(g). Congress granted *sole* discretion to the Attorney General in specifying the precise conditions and direction of each state officer's assistance. *Id.* Significantly, Congress has intoned that such discretion includes the Attorney General's ability to make an individual officer's immigration enforcement duties permissive or mandatory. 8 U.S.C. § 1357(g)(5).

Because Alabama law attempts to usurp Congress' clearly defined scheme for permitting the states to assist the federal government with immigration enforcement, it is pre-empted. Through sections 12(a), (b), Alabama has enacted a mandatory and systematic scheme that conflicts with Congress' explicit requirement that in the "[p]erformance of immigration officer functions by State officers and employees," such officers "shall be subject to the direction and

---

[10]    *See e.g., Ma v. Ashcroft*, 257 F.3d 1095 (9th Cir. 2001) (regarding a Cambodian national who could not be removed due to lack of repatriation agreement).

supervision of the Attorney General." 8 U.S.C. § 1357(g)(3). Section 12 therefore interferes with Congress' scheme because Alabama has assumed a role in directing its officers how to enforce the INA. Indeed, courts which have reviewed similar attempts have concluded that there is no "provision [under the INA] demonstrating that Congress intended to permit states to usurp the Attorney General's role in directing state enforcement of federal immigration laws." *United States v. Arizona*, 703 F. Supp. 2d 980, 1006 (D. Ariz. 2010), *aff'd*, 641 F.3d 339, 356 (9th Cir. 2011). Because Congress has establishes its intent and purpose through 8 U.S.C. § 1357(g), Alabama's attempt to regulate immigration on its own, fails. *Wyeth v. Levine*, 129 S. Ct. 1187, 1194-95 (2009); see *also United States v. Arizona*, *supra*, at 352 ("states do not have the inherent authority to enforce the civil provisions of federal immigration law."); *United States v. Urrieta*, 520 F.3d 569, 574 (6th Cir.2 008) ("local law enforcement officers cannot enforce completed violations of civil immigration law (i.e., illegal presence) unless specifically authorized to do so by the Attorney General under special conditions.")

## C.    HB56, Section 18 permits warrantless arrests and results in unconstitutionally prolonged detentions of persons who are legally in the United States but who are unable to present a valid driver's license.

**(C)(1).** Section 18, HB56 amends Section 32-6-9, Code of Alabama 1975, to require the mandatory detention and transportation of persons by a law office for failures to present an Alabama driver's license. HB56, Section 18(b) ("...if a law officer arrests a person for a violation of this section and the officer is unable to determine by any other means that the person has a valid driver's license, the officer *shall transport the person* to the nearest or most accessible magistrate.") (emphasis added).

Thus, persons who are stopped for even minor, *civil* traffic violations and who are unable to present a valid driver's license, *shall* be subject to mandatory detention and transported to a

magistrate.  *Id.*  Such prolonged detention constitutes an unreasonable search and seizure of persons in violation of the Fourth Amendment to the U.S. Constitution. *Mapp v. Ohio*, 367 U.S. 643 (1961) (holding that the Fourth Amendment applies to the states by way of the due process clause of the Fourteenth Amendment).  Moreover, the provision is a thinly veiled mechanism to stop, locate, arrest, and detain "unlawfully present" individuals.  Pursuant to HB56, Section 18(c), "a reasonable effort *shall be made* to determine the citizenship of the person and if an alien, whether the alien is lawfully present in the United States by verification with the federal government." (emphasis added).  Although the provision states that an officer shall not make a "final determination" regarding a person's immigration status, the law requires "some" determination which is *preliminary* in scope.  Such a *preliminary* determination is a necessary prerequisite in order for an officer to have a "reasonable suspicion" that a person is an alien or unlawfully present.  HB56, Section 18(c) ("An officer shall not attempt to independently make a *final* determination of whether an alien is lawfully present in the United States.") (emphasis added).

The provision further directs the law officer to verify the person's status with the federal government pursuant to 8 U.S.C. § 1373(c), and permits the warrantless arrest and detention of a person for a period of forty-eight (48) hours.  HB56, Section 18(d).  In situations, where a person is determined to be an alien "unlawfully present" in the United States, the law directs that the person shall be presumptively considered a flight risk and detained until prosecution or turned over to federal authorities, resulting in an unconstitutionally prolonged detention based strictly on the person's *perceived* immigration status.  *Id.*

Sections 19, 20 of the new legislation also require further status verifications to be made to the federal government whenever a person "is charged with a crime for which bail is required, or is confined for any period in a state, county, or municipal jail" and notification to the federal government  if an alien who is unlawfully present is convicted of a violation of state or local law and is within 30 days of release or has paid any fine.  This comprehensive scheme has but one

singular goal in mind: to cause the arrest, detention, and apprehension of persons who are "unlawfully present" in the state.

**(C)(2).**  Second, enforcement of Section 18, HB56 is impractical because there is no rational relationship between a person who fails to possess a valid driver's license, and an person who is "unlawfully present" in the United States.  For example,  a person who does not possess a valid driver's license may nonetheless be a person authorized by the federal government to be in the United States.  There are many examples of such situations.  An Alabama resident who is noncitizen married to a U.S. citizen and who has a pending application for adjustment of status with the USCIS may not have received an employment authorization document or other acceptable immigration documentation to receive an Alabama driver's license. *See generally* 8 C.F.R. § 245.2 (providing the USCIS with jurisdiction over adjustment of status applications); *See* Sections 32-6-10-1(b), (h), Code of Alabama 1975 (noting that the application for an Alabama driver's license to be issued to a foreign national shall contain, in addition to the information on the established application, the applicant's country of origin and the expiration date of the acceptable form of immigration documentation as outlined in this section).  Congress has also authorized that noncitizens who have entered the United States without inspection or admission are also eligible to apply for lawful permanent resident status upon the basis of an approved immigrant visa petition.  *See* INA § 245(i), 8 U.S.C. § 1255(i) (2000).  Such noncitizens, however, although *eligible* for federal immigration benefits would both be: (1) ineligible for receive an Alabama driver's license and; and (2) "unlawfully present" under Alabama law.

Similarly, noncitizens who qualify for cancellation of removal or temporary protected status are in an authorized period of stay in the United States, but may not be "lawfully present" as defined by Alabama law.  *See* 8 U.S.C. § 1229b (cancellation of removal), and § 1254a (temporary protected status).

A lawful permanent resident with an expired or old "green card" remains a lawful

permanent resident, and is not deportable, but he cannot receive a driver's license under Alabama law. *See, e.g.*, 8 U.S.C. § 1227 (listing classes of deportable aliens, and not including a ground for permanent residents without a valid green card); *see also* Sections 32-6-10-1(h), Code of Alabama 1975 (noting that the Director of the Department of Public Safety shall establish and promulgate rules and regulations concerning the enforcement of this section).

Asylum applicants must wait one hundred fifty (150) days before they can apply to receive an employment authorization document and/or an Alabama driver's license, yet such persons cannot be deported until and unless their claims are adjudicated and a final administrative removal order exists. *See* 8 C.F.R. § 208.7(a) (noting that the application shall be submitted no earlier than 150 days after the date on which a complete asylum application submitted); 8 U.S.C. §§ 1158 (establishing bases for asylum and procedures).

However, under existing Alabama law, such noncitizens would *not* qualify to receive a driver's license. *See* Section 32-6-10.1(e), Code of Alabama 1975 (noting that a driver's license issued to a foreign national shall expire on the date of the expiration of the acceptable form of immigration documentation provided at the time of application). Hence, while the federal government would recognize such noncitizens as being in a period of authorized stay in the United States, they would not pass the more restrictive test under Alabama law of "lawful presence," and would be subjected to unreasonable searches and seizures of their persons, property, and vehicles. *See* HB56, Sections 18(a), (b). Moreover, mandatory detention of such non-criminal, noncitizens would be unreasonable and in violation of their constitutional protections of liberty. *See e.g., Demore v. Kim*, 538 U.S. 510 (2003) (holding that mandatory detention of *criminal* aliens is constitutionally permissible for the period necessary to complete removal proceedings); *See also Zadvydas v. Davis*, 533 U.S. 678 (2001) (holding that the indefinite detention of immigrants was subject to constitutional limitations and the government was required to show removal in the foreseeable future or special circumstances to justify the same). Indeed, such a detention would be unconstitutionally prolonged as a potentially lengthy

immigration verification is conducted.

### D.   HB56, Section 8 unlawfully excludes classes of noncitizens who are authorized to be in the United States by the federal government.

**(D)(1).**  HB56 limits the class of noncitizens eligible to enroll in or attend any public postsecondary educational institution in Alabama. The provision is problematic for its internal inconsistency, as well as for its exclusion of broad categories of individuals given permission by the federal government to remain in the United States.

Like other provisions of HB56, section 8 relies upon a distinction between "lawfully present" aliens and those "unlawfully present." Under the terms of section 8, "[A]n alien who is not lawfully present in the United States shall not be permitted to enroll in or attend any public postsecondary institution."  Final verification of "lawful presence" is not left to any school, but entrusted to the federal government. In this way, use of the terms "unlawful presence" and "lawful presence" tracks their incorporation in other section of HB56. As explained above, the terms are unlikely to refer to the technical definition of unlawful presence found in the INA, but to a presumed statutory distinction between "legal" and "illegal" aliens—even though such a concept doesn't exist within the INA, and can't adequately describe the numerous and varied procedural positions an alien might hold.

However, section 8 also then describes the class of potentially eligible, lawfully present, noncitizen students as only including those who "possess lawful permanent residence or an appropriate nonimmigrant visa under 8 U.S.C. § 1101, et. seq." The apparent conflation of "lawfully present" aliens with those possessing a green card or nonimmigrant visa creates significant tension. Even though the former term—"lawful presence"—is ambiguous, one would think that it has some connection to the idea of having permission to remain in the country. Yet considerable numbers of aliens would be able to demonstrate some type of

permanent or temporary permission to remain, but would not have either of the two statuses listed in HB56—a green card or appropriate nonimmigrant visa.

**(D)(2).**  The law would exclude, for example, asylees and refugees who have not yet applied for, or received, permanent residency, or those granted restriction on removal, who have no path to residency, despite being allowed to remain indefinitely in the U.S. on account of the harm they would face in their home countries. See 8 U.S.C. §§ 1157, 1158 , 1231(b)(3); 8 C.F.R. § 1208.16. Other noncitizens unreasonably made ineligible would include those granted Temporary Protected Status ("TPS"), who have been permitted to enter and remain in the U.S. on account of extraordinary and temporary conditions in their home country, such as an environmental disaster or an ongoing armed conflict.   TPS recipients do not have an independent path to residency, but are not removable, and are allowed to work in the U.S.  *See* 8 U.S.C. § 1254a.  Also swept into the excluded class would be certain crime victims and abused noncitizens potentially eligible for future residency based upon the harm they endured, but unable to immediately adjust status.  Such individuals would include U-visa holders, who must remain in that status for three (3) years before proceeding to residency, or beneficiaries of self-petitions under the Violence Against Women Act ("VAWA") who are waiting for visas to become available.  *See* 8 U.S.C. §§ 1225(m).  Finally, the list of excluded noncitizens would include people for whom the federal government has chosen to exercise a measure of prosecutorial discretion, either by not initiating removal proceedings, or electing not to execute a previously issues removal order, based upon its evaluation of various humanitarian factors. Among the list of equitable factors, particular consideration is given to those young men and women who have been present in the U.S. since childhood, and who graduated from a U.S. high school or are pursing postsecondary education. *See*, John Morton, Director of Immigration and Customs Enforcement, Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens (June 17, 2011). It would be especially ironic if those potential

1 students—given a measure of administrative grace on account of their potential for academic

2 achievement—were then excluded by the unreasonably restrictive provisions of section 8.

3 The use of the phrase "*appropriate* nonimmigrant visa" reflects a serious

4 misunderstanding of immigration law. The purpose of a nonimmigrant visa is to allow its

5 holder to apply for admission to the United States. Once admitted, the visa does *not* control

6 how long its holder is permitted to remain in the United States, or the individual's immigration

7 status. The period of authorized stay and the status are controlled, for the most part, by an

8 Arrival/Departure Record (Form I-94) issued by U.S. Customs and Border Protection at a port

9 of entry, or by the U.S. CIS after entry. The duration of the actual nonimmigrant visa is based

10 on reciprocal agreements between the United States and other nations.[11]

11 Nonimmigrants who come to the U.S. to study are generally granted F-1, J-1, or M-1

12 status. 8 U.S.C. § 1101(a)(15)(F), (J), (M). Given the breadth of the statute, it is conceivable

13 that only noncitizens possessing an F-1, J-1, or M-1 nonimmigrant visa will be permitted to

14 attend a public postsecondary school. This could exclude two (2) large classes of

15 nonimmigrants permitted to attend school. The first would be F-1, J-1, or M-1 nonimmigrants

16 who entered with a visa in a different nonimmigrant category and then changed their status to

17 F-1, J-1, or M-1. These students would not have a visa in their current status. The second class

18 would be nonimmigrants in other categories, including temporary workers, and spouses or

19 unmarried children under twenty-one (21) years of age of nonimmigrants. Other than some

20 nonimmigrant visitors for pleasure, it is usually appropriate and consistent with the terms of

21 admission for nonimmigrants and their spouses and unmarried children under twenty-one (21)

22 years of age to attend school. As with other portions of HB56, this section reflects a

23 fundamental misunderstanding of immigration law. It will discourage noncitizens who are

24 lawfully present in the United States and authorized to attend school from living in Alabama and

25

26

27 [11] The reciprocity tables for each country are located at http://travel.state.gov/visa/fees/fees_3272.html (last visited Aug. 2, 2011).

28

its citizens, who will be deprived of the contributions these noncitizens will provide.

    **E.**    **HB56, Section 28 unlawfully restricts access to public education and denies education in violation of federal law and to persons who are authorized to be in the United States but are not lawful permanent residents or nonimmigrant visa holders.**

    **(E)(1).**  HB56, Section 28 interferes with the right and access to education, and creates an unworkable, discriminatory environment requiring Alabama schools to determine the immigration status of students, their parents, and arguably permits such data collection and compilation to be reported to federal authorities.  HB56, Sections 28(a), 28(a)(5).

    Section 28 violates federal law by chilling access to public education by noncitizen children and their parents.  Pursuant to section 28(a)(1), "every public elementary and secondary school... at the time of enrollment in kindergarten or any grade in such school, shall determine whether the student enrolling in public school was born outside the jurisdiction of the United States *or is the child of an alien not lawfully present in the United States."*  HB56, Section 28(a)(1) (Emphasis added).  Although the legislature has stated that the intended purpose of the law is to "measure and assess the population of students who are aliens not lawfully present," it should be clearly noted that the law requires that all public schools "shall determine" whether the child is of an alien not lawfully present in the United States.  Thus, the law's reach goes beyond the stated purpose of merely "measur[ing] and assess[ing]" the population of students, but seeks to compile data on the *parents* of children so enrolled.  *Id.*

    Such a requirement impedes the free access to education and is designed to identify and locate noncitizen parents of children enrolled in Alabama schools.  Furthermore, the law provides that parents of foreign born children must *affirmatively* provide the citizenship or immigration status of the child sought to be enrolled through a burdensome procedure.  HB56, Section 28(a)(3).  The law requires that such notification "shall consist of both" the presentation of official immigration documentation, and an attestation by the parent, guardian, or legal

custodian.  HB56, Section 28(a)(4).  The law states that the failure to present either such documentation or declaration mandates that the school official "shall presume for the purposes of reporting" that the student "is an alien unlawfully present in the United States."

When this provision is read into harmony with another provision, Section 6(c), it is clear the intended purpose of Section 28 is to identify foreign born children and their parents.  This identification, in turn, is designed with a singular purpose to report such children and their parents to the immigration authorities.  *See* Section 6(c) ("Except as provided by this act, officials or agencies of this state, or any subdivision thereof... may *not be prohibited or in any way be restricted* from *sending, receiving, or maintaining information relating to the immigration status*, lawful or unlawful, of any individual or exchanging that information with any other federal, state, or local government entity...") (emphasis added).  Because the collection and data compilation of the identity of foreign born children enrolling in school, as well as the immigration statuses of their parents, combined with the prohibitions against reporting such information to the federal government, the legislature's intent is clearly gleaned: to prevent[12] the enrollment of foreign born children *and* the children of foreign born parents (many of whom are U.S. citizens) in public Alabama schools.  Such conduct is in violation of federal law.

**(E)(2).**  In *Plyer v. Doe*, 457 U.S. 202 (1982), the Supreme Court declared invalid a state statute, similar to the one espoused in Section 28, HB56, which denied state funding for education to undocumented noncitizens and simultaneously found invalid a municipal school district's attempt to charge undocumented noncitizens an annual $1,000 tuition fee for each undocumented child enrolled in school to compensate for the state's lost funding.

In declaring the state scheme invalid, the Court found that the Texas law was "directed against children, and impose[d] its discriminatory burden on the basis of a legal characteristic

---

[12]  State Representative Hammon described the bill's purpose as to prevent the costs of "educati[ing] the children of illegal immigrants."  *See* David White, *Alabama Legislative Panel Delays Voting on Illegal Immigration Bill*, The Birmingham News (Mar. 3, 2011).  In addition, he added that such provisions would result in a "cost savings for the state."

over which children can have little control" — namely, the fact of their having been brought illegally into the United States by their parents. *Id.* at 221. The Court also noted that denying the children a proper education would likely contribute to "the creation and perpetuation of a subclass of illiterates within our boundaries, surely adding to the problems and costs of unemployment, welfare, and crime." *Id.* at 230. The Court found that where a state discriminates between different classes of aliens, the state discrimination must be examined under an immediate level of scrutiny to determine whether it furthers a substantial goal of the state. *Id.* In applying intermediate scrutiny, the Court refused to accept that any substantial state interest would be served by discrimination on this basis, and it therefore found invalid the Texas law.

Here, Section 28, HB56, espouses the same intent as the Texas law, – namely to deny and restrict access to undocumented alien, children. Although Section 28 is not identical to the mechanisms of the Texas scheme, the *intent* is the same. By requiring the identification of undocumented children, their parents, and providing provisions for the compilation of such data and reporting to federal immigration officials, the Alabama provision would create a "chilling" effect upon the enrollment of undocumented alien children. Clearly, undocumented parents and their children would forgo enrollment in Alabama schools in order to avoid federal immigration apprehension. The fear created by such a scheme frustrates exactly what the Supreme Court declared to be invalid in *Plyer v. Doe* – a state's attempt to restrict access by undocumented children to a publicly funded state education. As such, Section 28, violates the clear dictates of federal law. The Alabama legislature's expressed purpose of saving financial resources and other costs is identical to Texas' motivation found to be an insufficient interest by the Court in *Plyer*. *Id.* at 230 ("..It is thus clear that whatever savings might be achieved by denying these children an education, *they are wholly insubstantial in light of the costs* involved to these children, the State, and the Nation.") (emphasis added).

As in other areas of HB56, the laws provisions ignore the fact that some noncitizens may be authorized by the federal government to be in the United States, yet would be "unlawfully

present" under Section 3(10)'s definitions. For example, some children born outside of the United States may be U.S. citizens by virtue of acquisition or derivation of U.S. citizenship. *See* 8 U.S.C. §§ 1401, 1409 (setting out various conditions whereupon individuals may acquire U.S. citizenship at birth). *See also* 8 U.S.C. § 1431(b) (setting forth conditions whereupon adopted alien children acquire U.S. citizenship automatically); *Matter of Rodriguez-Tejedor*, 23 I&N Dec. 153 (BIA 2001). Such children, however, may not be aware they possess U.S. citizenship and risk being reported to federal authorities under Sections 28(d), 6(c) mandates; some children may not even enroll out of fear of being apprehended. Moreover, some children who are U.S. citizens may not be enrolled by their undocumented parents out of the same fear of being apprehended by the federal government. Such an intended and purposeful restriction on the access to education is clearly violative of the Supreme Court's holding in *Plyer*.

Finally, some children and/or their parents may be eligible to be in the United States by the federal government or in authorized period of stay, but may not be U.S. citizens or lawful permanent residents. As noted throughout this brief, some noncitizens may *not* possess documents from the federal government documenting their lawful status in the United States (i.e., asylum applicants, adjustment of status applicants, cancellation of removal applicants, TPS registrants, etc.). Yet, section 28(a)(5), mandates that students who cannot present documentation regarding their immigration status "shall [be] presumed for the purpose of reporting... that the student is an alien unlawfully present in the United States." Read in conjunction with section 8, these students – although authorized to be in the United States – would effectively be denied an education through the law's scheme[13].

---

[13]    Indeed, the federal government has recognized the importance of education and has chosen to limit enforcement operations at or near schools. *See* Memo, Julie A. Myers, *Field Guidance for Enforcement Actions or Investigative Activities At or Near Sensitive Community Locations*, Jul. 3, 2008, *available at http://iwp.legalmomentum.org/reference/additional-materials/immigration/enforcement-detention-and-criminal-justice/government-documents/IMM_EDJC%20hd-enfor_actions_sens_community_locations%207.3.08.pdf/at_download/file* (last visited Aug. 2, 2011).

- 27 -

1

2                                    **IV.    CONCLUSION**

3

4          AILA, like many of Alabamians, is frustrated over the failure of the federal government

to fix our broken immigration system. However, the Alabama law presents an unworkable and

5

unlawful response to this frustration.  It ought be enjoined as it cannot be implemented in a fair

6

and constitutional manner.

7                                                            Respectfully submitted,

8                                                            _____/s/_____

9                                                            Vikram K. Badrinath, Esq.
                                                             VIKRAM BADRINATH, P.C.
10                                                           100 North Stone Ave., Suite 302
                                                             Tucson, AZ  85701-1514
11                                                           (520) 620-6000
                                                             *vbadrinath@aol.com*
12                                                           *Pro Hac Vice*

13

14   Russel R. Abutryn, Esq.                    Mark R. Barr, Esq.
     MARSHAL E. HYMAN & ASSOCIATES              LICTHER & ASSOCIATES, P.C.
15   3250 West Big Beaver, Suite 529            1601 Vine Street
     Troy, MI 48084                             Denver, CO 80206
16   (248) 643-0642, Ext. 15                    (303) 554-8400
     *rabrutyn@marshallhyman.com*               *mbarr@lichterassociates.com*
17
     Andres Benach, Esq.                        Deborah S. Smith, Esq.
18   DUANE MORRIS, LLP                          LAW OFFICE OF DEBORAH S. SMITH
     505 9th Street, N.W. Suite 100             7 West Sixth Avenue, Suite 4M
19   Washington, D.C. 20004-2166                Helena, MT 59601
     (202) 776-7812                             (406) 457-5345
20   *ACBenach@duanemorris.com*                 *deb@debsmithlaw.com*

21

22   Attorneys for *Amicus Curiae*
     American Immigration Lawyers Assoc.

23

     Dated: August 5, 2011

24

25

26

27

28                                               - 28 -

1  Vikram K. Badrinath, Esq. *(Pro Hac Vice)*
   VIKRAM BADRINATH, P.C.
2  100 North Stone Avenue, Suite 302
   Tucson, AZ  85701-1514
3  (520) 620-6000
   AZ Bar No. #016360
4  vbadrinath@aol.com

5              **IN THE UNITED STATES DISTRICT COURT**

6              **FOR THE NORTHERN DISTRICT OF ALABAMA**

7  HISPANIC INTEREST COALITION, *et. al.*,  )    Case No.:  **CIV-11-02484-SLB**
                                            )    Date:      **08/05/11**
8              *Plaintiffs*,                )
                                            )
9              vs.                          )
                                            )
10 ROBERT BENTLEY, in his official capacity )
   as Governor of the State of Alabama,     )
11 *et. al.*                                )
                                            )
12             *Respondents*.               )    **CERTIFICATE OF SERVICE**
                                            )
13 _____)

14      I am a citizen of the United States over the age of 18 years, a resident of Pima county and
   not a party to the instant action.  My business address is: 100 North Stone Avenue, Suite 302,
15 Tucson, Arizona 85701-1514.  On August 5, 2011, I served a copy of the following:

16            **MEMORANDUM BRIEF OF *AMICUS CURIAE* (AILA)**

17 by transmitting the same electronically through the U.S. District Court ECF/CM System, and
   that such transmission complies with the Court's General Order on Electronic Case Filing
18 Policy and Procedures, in that it was sent electronically to all registered users in this
   above-entitled action.  By signing below, I hereby certify that compliance was made as noted
19 above by transmitting to the Clerk's Office using the ECF/CM System for filing and transmittal
   of a Notice of Electronic Filing for all the following ECF/CM registrants.
20      Alternatively, non-ECF/CM registered users were served by placing one (1) copy of the
   same in a sealed envelope with postage fully paid thereon, in the United States Postal Service
21 at Tucson, Arizona, on August 5, 2011, addressed as follows:

22                    **See Attached Service List**

23                              Respectfully submitted,

24                              _____/s/_____
                                Vikram K. Badrinath, Esq.
25                              VIKRAM BADRINATH, P.C.
                                Co-Counsel for *Amicus Curiae*
26 Dated: August 5, 2011        American Immigration Lawyers Assoc.

27

28                                    - 29 -

## SERVICE LIST

### Plantiffs Attorneys

Mary Bauer (ASC-1181-R76B)
Andrew H. Turner (ASB-8682-W84T)
Samuel Brooke (ASB-1172-L60B)
SOUTHERN POVERTY LAW CENTER
400 Washington Ave.
Montgomery, Alabama 36104
T: (404) 956-8200
*mary.bauer@splcenter.org*
*andrew.turner@splcenter.org*
*samuel.brooke@splcenter.org*


Andre Segura*
Elora Mukherjee*
Omar C. Jadwat*
Lee Gelernt*
Michael K. T. Tan*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
T: (212) 549-2660
*asegura@aclu.org*
*emukherjee@aclu.org*
*ojadwat@aclu.org*
*lgelernt@aclu.org*
*mtan@aclu.org*


Cecillia D. Wang*
Katherine Desormeau*
Kenneth J. Sugarman*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, California 94111
T: (415) 343-0775
*cwang@aclu.org*
*kdesormeau@aclu.org*
*irp_ks@aclu.org*


Linton Joaquin*
Karen C. Tumlin*
Shiu-Ming Cheer*
Melissa S. Keaney*
Vivek Mittal*
NATIONAL IMMIGRATION LAW

- 30 -

CENTER
3435 Wilshire Boulevard, Suite 2850
Los Angeles, California 90010
T: (213) 639-3900
joaquin@nilc.org
tumlin@nilc.org
cheer@nilc.org
keaney@nilc.org
mittal@nilc.org

Michelle R. Lapointe*
Naomi Tsu*
Daniel Werner*
SOUTHERN POVERTY LAW CENTER
233 Peachtree St., NE, Suite 2150
Atlanta, Georgia 30303
T: (404) 521-6700
naomi.tsu@splcenter.org
michelle.lapointe@splcenter.org
daniel.werner@splcenter.org
Sin Yen Ling*
ASIAN LAW CAUCUS
55 Columbus Avenue
San Francisco, CA 94111
T: (415) 896-1701 x 110
sinyenL@asianlawcaucus.org

Tanya Broder*
NATIONAL IMMIGRATION LAW
CENTER
405 14th Street, Suite 1400
Oakland, California 94612
T: (510) 663-8282
broder@nilc.org

Freddy Rubio (ASB-5403-D62R)
Cooperating Attorney, ACLU of Alabama
Foundation
Rubio Law Firm, P.C.
438 Carr Avenue, Suite 1
Birmingham, AL 35209
T: (205) 443-7858
frubio@rubiofirm.com

Erin E. Oshiro*
ASIAN AMERICAN JUSTICE
CENTER,
MEMBER OF THE ASIAN AMERICAN
CENTER FOR ADVANCING JUSTICE
1140 Connecticut Ave., NW
Suite 1200
Washington, DC 20036
T: (202) 296-2300

- 31 -

1  *eoshiro@advancingequality.org*

2  Herman Watson, Jr. (ASB-6781-O74H)
   Eric J. Artrip (ASB-9673-I68E)
3  Rebekah Keith McKinney (ASB-3137-T64J)
   Watson, McKinney & Artrip, LLP
4  203 Greene Street
   P.O. Box 18368
5  Huntsville, Alabama 35804
   T: (256) 536-7423
6  *watson@watsonmckinney.com*
   *mckinney@watsonmckinney.com*
7  *artrip@watsonmckinney.com*

8  G. Brian Spears*
   1126 Ponce de Leon Ave., N.E.
9  Atlanta, Georgia 30306
   T: (404) 872-7086
10 *Bspears@mindspring.com*

11 Ben Bruner (ASB-BRU-001)
   THE BRUNER LAW FIRM
12 1904 Berryhill Road
   Montgomery, Alabama 36117
13 T: (334) 201 0835
   *brunerlawfirm@gmail.com*

14

15 **Defendants Attorneys**

16
   Misty S Fairbanks
17 Winfield J. Sinclair
   Office of the Attorney General, State of Alabama
18 501 Washington Ave.
   Montgomery, AL 36104
19
   J.R. Brooks, Esq.
20 LANIER FORD SHAVER & PAYNE P.C.
   P.O. Box 2087
21 Huntsville, AL 35804
   *(who has represented that he is authorized to accept service for Defendants*
22 *Wardynski, Warren, Blair, Fuller, Thompson, and Langham).*

23

24 **Attorneys for *Amicus Curiae* American Immigration Lawyers Association**

25 Vikram K. Badrinath
   Vikram Badrinath, P.C.
26 100 North Stone Ave., Ste. 302
   Tucson, AZ 85701-1514
27 *vbadrinath@aol.com*

28                                    - 32 -